

FILED IN CHAMBERS
U.S.D.C. - Atlanta

JUL 29 2019

James N. Hatten, Clerk
By: KLT   Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

MARIA CHRISTINA "META" ULLINGS,
a/k/a Maria Christina Paula Huijsman.

Criminal Number: 1:10-CR-406

### AFFIDAVIT IN SUPPORT OF REQUEST FOR EXTRADITION

I, Jason David Jones, being duly sworn, depose and state:

1.    I am a citizen of the United States of America, residing in the state of Maryland.

2.    From September 2009 until the present, I have been employed by the United States Department of Justice as a Trial Attorney for the Antitrust Division. I submit this sworn affidavit pursuant to Article X of the Extradition Treaty between the U.S. and the Republic of Italy (2006) (the "Extradition Treaty"), which states that requests for extradition must be accompanied by, among other things, "the texts of the laws describing the essential elements and the designation of the offense for which extradition is requested; the texts of the laws describing the punishment for the offense; and the texts of the laws describing the time limit on the prosecution or the execution of the punishment for the offense."

3.    As a Trial Attorney, my duties include investigating and prosecuting companies and individuals charged with criminal violations of the laws of the United States. During my practice as a Trial Attorney, I have become knowledgeable about the criminal laws and procedures of the United States, including violations of the Sherman Antitrust Act, Title 15 of the U.S. Code, Section 1, which makes it a crime for competitors to agree to fix prices, rig bids,

or allocate customers or markets. In the course of my duties I have become familiar with the charges and the evidence in the case of <u>United States of America v. Maria Christina "Meta" Ullings</u>, Criminal Number 1:10-CR-406 (also referred to as Case Number 10-cr-406 (UNA)).

4.     As described in greater detail in the attached indictment and the Affidavit of Special Agent Davida K. Law, an investigation by the Federal Bureau of Investigation ("FBI") revealed that the subject of this extradition request, Maria Christina "Meta" Ullings ("Ullings"), among others, was a member of a conspiracy to fix and coordinate certain surcharges, including fuel surcharges, charged to customers in the United States and elsewhere for international air shipments of air cargo to and from the United States. This conspiracy, which began in 2001, involved air cargo carriers and their executives from all over the world. In uncovering and prosecuting this cartel, the Department of Justice has brought charges against 21 executives and 22 corporations. Over $1.8 billion in fines have been collected from these companies and numerous executives have also been sentenced to imprisonment for their involvement.

5.     On 21 September 2010, a federal grand jury of the U.S. District Court for the Northern District of Georgia returned and filed an Indictment charging Ullings with entering into and participating in a conspiracy to suppress and eliminate competition by fixing and coordinating certain surcharges, including fuel surcharges, charged to customers located in the United States and elsewhere for international air shipments to and from the United States, in violation of Section 1 of Title 15 of the United States Code. An indictment is a formal accusation or charging document issued by a grand jury, which is a part of the judicial branch of the U.S. government. A grand jury consists of 16 to 23 citizens impaneled to review evidence of crimes presented to it by United States law enforcement authorities. Each member of the grand

jury must review the evidence presented and determine whether there is probable cause to believe that a crime has been committed and that the Defendant committed the crime. The grand jury may issue an indictment charging the Defendant with a crime when at least 12 grand jurors determine that there is probable cause to believe that the Defendant committed the crime. I have obtained a certified copy of this Indictment, case number 10-cr-406, from the Clerk of the U.S. District Court of the Northern District of Georgia, and attached it to this affidavit as Exhibit A.

6.      After an indictment is issued, the court will normally issue a warrant for the arrest of the Defendant. On 21 September 2010, the Clerk of the United States District Court for the Northern District of Georgia, James N. Hatten, issued a warrant for the arrest of Ullings for this offense. I have obtained a certified copy of the arrest warrant from the Clerk of the U.S. District Court of the Northern District of Georgia, and attached it to this affidavit as Exhibit B.

7.      The statute cited in the indictment and applicable to this case is Section 1 of Title 15 of the United States Code. A violation of this statute is punishable by a maximum sentence of more than one year in prison under United States law. This statute was a duly enacted law of the United States at the time that the offense was committed and at the time the Indictment was filed, and is now in effect. A copy of this statute is attached as Exhibit C.

8.      The indictment charges Ullings with participating in a conspiracy to fix prices charged to customers for the shipment of air cargo to and from the United States. A conspiracy is simply an agreement between two or more people to a common plan or scheme that is illegal—in this case, to agree to fix prices.

9.      Under U.S. law, the act of combining and agreeing among two or more persons to unreasonably restrain trade or commerce by fixing prices, rigging bids, or allocating customers

or markets is a crime in and of itself. The agreement needed to form a conspiracy need not be formal, and may be simply a mutual understanding, as evidenced by the conspirators' course of conduct. Under U.S. law, a conspiracy is deemed to be a partnership for criminal purposes so that each member or participant becomes the agent or partner of every other member. Therefore, a defendant is a member of the conspiracy if she understands the unlawful nature of the plan and knowingly joins in that plan. The agreement on which the conspiracy is based need not be expressed in writing or in words, but may be simply a tacit understanding by two or more persons to do something illegal. When joining a conspiracy, conspirators enter into a partnership for a criminal purpose in which each member or participant becomes a partner or agent of every other member. A conspirator can be held criminally responsible for all reasonably foreseeable actions undertaken by other conspirators in furtherance of the criminal partnership.

10.     To convict Ullings, the government must establish beyond a reasonable doubt each of the following essential elements at trial:

First:      That the conspiracy described in the Indictment existed at or about the time alleged;

Second:   That the defendant knowingly joined the conspiracy; and

Third:     That the conspiracy either affected interstate and/or foreign commerce or occurred within the flow of interstate and/or foreign commerce.

In other words, in this case the United States must show beyond a reasonable doubt that the conspiracy among international air cargo carriers described in the Indictment existed between 2001 and 2006; that Ms. Ullings knowingly joined that conspiracy; and that the conspiracy among international air cargo carriers either affected interstate and/or foreign commerce or occurred within the flow of interstate and/or foreign commerce.

11.    The United States respectfully notes that Article II ("Extraditable Offenses") of the Extradition Treaty specifically states that the Extradition Treaty is applicable for offenses containing an element related to interstate commerce:

> The provisions of this Article apply whether or not the offense is one for which the United States federal law requires proof of an element, such as interstate transportation, the use of the facilities of interstate commerce, or the effects upon such commerce, since such an element is required for the sole purpose of establishing the jurisdiction of United States federal courts.

12.    The maximum penalty for a violation of Section 1 of Title 15 of the United States Code as charged in the Indictment, is a term of 10 years' imprisonment.

13.    The statute of limitations on prosecuting this offense is Section 3282 of Title 18 of the United States Code, which states:

> Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

Once an indictment has been filed in a federal district court, as with the charge against Ullings, the statute of limitations is tolled and no longer runs. This prevents a criminal from escaping justice by simply hiding out and remaining a fugitive for an extended period of time. In addition, under the laws of the United States, the statute of limitations for a continuing offense, such as conspiracy, begins to run upon the conclusion or completion of the offense, not upon the date it commenced. Since the applicable statute of limitations is five years, the Indictment dated 21 September 2010, which charges a criminal conspiracy continuing until at least February 2006, was filed within the prescribed time.

14.     Maria Ullings is a citizen of the Netherlands, born on 28 April 1954, in the Netherlands.  Attached as Exhibit D is the affidavit of Special Agent Davida Law of the Federal Bureau of Investigation, which further details the evidence against Ullings and provides additional information on the identification of Ullings.  Ullings was provisionally arrested on or about 10 July 2019, in Palermo, Italy, and is currently detained pending extradition proceedings.

15.     Each of these affidavits was sworn to before a United States Magistrate Judge legally authorized to administer an oath for this purpose.  I have thoroughly reviewed these affidavits and the attachments to them, and attest that this evidence indicates that Maria Ullings is guilty of the offenses charged in the indictment.


Jason David Jones
Trial Attorney



Signed and sworn to before me this **29** day of July, 2019, in Atlanta, Georgia.


Linda T. Walker
United States Magistrate Judge
Northern District of Georgia


Page 6 of 6

<u>List of Exhibits</u>

A. Indictment, dated 21 September 2010

B. Arrest Warrant, dated 21 September 2010

C. Relevant Statutes

D. Affidavit of Special Agent Davida K. Law

# Exhibit A

**FILED IN CHAMBERS**
U.S.D.C. Atlanta

**ORIGINAL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SEP 2 1 2010

JAMES N. HATTEN, Clerk
By: _Edwards_
Deputy Clerk

UNITED STATES OF AMERICA      )
                              )
        v.                    )       Crim. No. :
                              )
MARIA CHRISTINA "META" ULLINGS )      1: 10-CR-406
                              )       Violation:
        Defendant.            )       15 U.S.C. § 1
                              )

## INDICTMENT

The Grand Jury in and for the Northern District of Georgia, charges:

## DEFENDANT AND CO-CONSPIRATORS

1.      Martinair Holland N.V. ("Martinair Cargo") is a corporation organized and existing under the laws of The Netherlands with its principal place of business in Amsterdam, Netherlands. Martinair Cargo's United States headquarters is located in Atlanta, Georgia. During the period covered by this Indictment, Martinair Cargo was engaged in the business of providing air transportation services for cargo in the United States and elsewhere.

2.      MARIA CHRISTINA "META" ULLINGS is hereby indicted and made a Defendant on the charge in this Indictment. During the period from January 2001 until February 2006, Defendant was Senior Vice President Cargo Sales and Marketing with Martinair Cargo, and was based in Amsterdam, Netherlands. During the period covered by this Indictment, Defendant, on behalf of Martinair Cargo, was engaged in the business of providing air transportation services for cargo in the United States and elsewhere.

**ATTEST: A TRUE COPY**
**CERTIFIED THIS**

JUL 2 6 2019

James N. Hatten, Clerk
By: _____
Deputy Clerk

3.    Various corporations and individuals, not made defendants in this Indictment, participated as co-conspirators in the offense charged herein and performed acts and made statements in furtherance thereof.

4.    Whenever in this Indictment reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control or transaction of its business or affairs.

## BACKGROUND OF THE OFFENSE

5.    During the period covered by this Indictment, Martinair Cargo and Defendant's co-conspirators provided international air transportation services for cargo ("air cargo services") to and from the United States.  Defendant's employer, Martinair Cargo, transported a variety of cargo, such as heavy equipment, perishable commodities, and consumer goods, on scheduled flights internationally, including to and from the United States.  For air cargo services, Defendant, on behalf of Martinair Cargo, charged customers a rate that consisted of both a base rate and various fees, such as surcharges for fuel and post-September 11 security.  The rates charged by Defendant's co-conspirators for air cargo services also included both a base rate and various fees.  The amount of the base rate charged by Martinair Cargo and Defendant's co-conspirators could vary based on the type and weight of the shipment, the origin and/or destination of the shipment, and the nature of the goods or products being shipped.  Similarly, the amount of certain surcharges levied by Martinair Cargo and Defendant's co-conspirators could vary based on the origin and/or destination of the shipment.  The base rate and surcharges

2

charged to customers by Martinair Cargo and Defendant's co-conspirators for air cargo services

are collectively referred to herein as "cargo rates."

## DESCRIPTION OF THE OFFENSE

6.      Beginning at least as early as January 2001, and continuing until *at* as least February

2006, the exact dates being unknown to the Grand Jury, Defendant and her co-conspirators

entered into and participated in a conspiracy to suppress and eliminate competition by fixing and

coordinating certain surcharges, including fuel surcharges, charged to customers located in the

United States and elsewhere for international air shipments to and from the United States.  The

combination and conspiracy engaged in by Defendant and her co-conspirators was an

unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of

the Sherman Act (15 U.S.C. § 1).

7.      The charged combination and conspiracy consisted of a continuing agreement,

understanding, and concert of action among Defendant and her co-conspirators, the substantial

terms of which were to suppress and eliminate competition by fixing and coordinating certain

surcharges, including fuel surcharges, on air cargo shipments to and from the United States.

## MANNER AND MEANS OF THE CONSPIRACY

8.      For purposes of forming and carrying out the charged combination and

conspiracy, Defendant and her co-conspirators did those things that they conspired to do,

including, among other things:

(a)     participating in meetings, conversations, and communications in the

United States and elsewhere to discuss prospective changes in certain

surcharges to be charged for shipments to and from the United States;

3

(b)  agreeing to fix, coordinating, and reaching understandings regarding

certain surcharges to be imposed as components of the cargo rates;

(c)  issuing announcements of increases on certain surcharges in accordance

with the coordination, agreements and understandings reached;

(d)  levying certain surcharges to and from the United States in accordance

with the coordination, agreements and understandings reached;

(e)  engaging in meetings, conversations, and communications in the United

States and elsewhere for the purpose of implementing and monitoring the

surcharge agreements, understandings and coordination; and

(f)  accepting payment for shipments to and from the United States at

collusive and noncompetitive rates.

## TRADE AND COMMERCE

9.  During the period covered by this Indictment, proposals, contracts, invoices for

payment, payments, and other documents essential to the provision of air cargo services were

transmitted in interstate and foreign trade and commerce between and among the offices of

Martinair Cargo and its customers located in various States and foreign countries.

10.  During the period covered by this Indictment, Defendant and her co-conspirators

transported substantial quantities of cargo, in a continuous and uninterrupted flow of interstate

and foreign commerce, between various foreign countries and the United States, including

through various U.S. airports to final destinations in various States.

11.  During the period covered by this Indictment, the business activities of Defendant

and her co-conspirators in connection with the air cargo services that are the subject of this

Indictment were within the flow of, and substantially affected, interstate and foreign trade and commerce.

## JURISDICTION AND VENUE

12.    The offenses charged in this Indictment were carried out, in part, in the Northern District of Georgia within the five years preceding the return of this Indictment.

In violation of Title 15, United States Code, Section 1.

Dated: Sep 21, 2010

A TRUE BILL:

_____
FOREPERSON

_____
SCOTT D. HAMMOND
Deputy Assistant Attorney General
Antitrust Division
U.S. Department of Justice

_____
MARC SIEGEL
Director of Criminal Enforcement
Antitrust Division
U.S. Department of Justice

_____
SALLY QUILLIAN YATES
United States Attorney
Northern District of Georgia

_____
LISA M. PHELAN
Chief
National Criminal Enforcement Section
Antitrust Division
U.S. Department of Justice

_____
MARK R. ROSMAN
MARK C. GRUNDVIG
National Criminal Enforcement Section
Antitrust Division
U.S. Department of Justice
450 5th Street, NW, Suite 11300
Washington, DC 20530
(202) 305-1878

5

WILLIAM D. DILLON

Atlanta Field Office
Antitrust Division
U.S. Department of Justice
75 Spring Street, SW, Suite 1176
Atlanta, GA 30303
(404) 331-7100

# Exhibit B

AO 442 (12/85) Warrant for Arrest

RECEIVED

**UNITED STATES DISTRICT COURT**

2010 SEP 21   PM 3:49   **NORTHERN DISTRICT OF GEORGIA**

U.S. MARSHALS SERVICE
NORTHERN GEORGIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | **WARRANT FOR ARREST** |
| vs. | AGENT TO ARREST |
| MARIA CHRISTINA "META" ULLINGS | CASE NO. 1:10-CR-406 |

To:   The United States Marshal
      and any Authorized United States Officer

**YOU ARE HEREBY COMMANDED** to arrest MARIA CHRISTINA "META" ULLINGS and
bring him or her forthwith to the nearest magistrate to answer a(n)

**X** Indictment   ☐ Information   ☐ Complaint   ☐ Order of Court   ☐ Violation Notice   ☐ Probation Violation Petition

Charging him or her with (brief description of offense): UNREASONABLE RESTRAINT OF INTERSTATE AND

FOREIGN TRADE BY FIXING SURCHARGES ON SHIPMENTS in violation of **Title 15, United States Code,**

**Section(s) 1 (The Sherman Act).**

ATTEST: A T.
CERTIFIED

JUL 2 6 2019

| | |
|---|---|
| JAMES N. HATTEN | Clerk, U.S. District Court |
| Name of Issuing Officer | Title of Issuing Officer |
| *S. Edwards* | By: James N. Hatten, Clerk / Deputy Clerk |
| Signature of Issuing Officer / Deputy Clerk | |
| | September 21, 2010 at Atlanta, Georgia |
| | Date and Location |

| | |
|---|---|
| Bail Fixed at $_____ | By:_____ |
| | Name of Judicial Officer |

---

**RETURN**

This warrant was received and executed with the arrest of the above-named defendant at:

_____

| | |
|---|---|
| Date Received:   _____ | _____ |
| | Name and Title of Arresting Officer |
| Date of Arrest:   _____ | _____ |
| | Signature of Arresting Officer |
| AUSA: William Dillon (Anti-Trust) | |

## EXHIBIT C

**Section 1 of Title 15 of the United States Code.**
**Trusts, etc., in restraint of trade illegal; penalty**

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.  Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

**Section 3282 of Title 18 of the United States Code.**
**Statute of Limitations**

> Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed. …

# Exhibit D

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

MARIA CHRISTINA "META" ULLINGS,
a/k/a Maria Christina Paula Huijsman.

Criminal Number: 1:10-CR-406

## AFFIDAVIT IN SUPPORT OF REQUEST FOR EXTRADITION

I, Davida K. Law, being duly sworn, depose, and state:

1.      I am a citizen of the United States residing in the State of Georgia

2.      I am a Special Agent employed by the Federal Bureau of Investigation ("FBI"), a
police agency of the United States.  I have been an FBI Special Agent for 23 years.  As an FBI
Special Agent, I am authorized to investigate possible violations of criminal laws of the United
States, including those laws contained in Titles 15 and 18 of the United States Code, and to
execute search warrants and arrests.

3.      My duties as an FBI Special Agent include the investigation in United States v.
Maria Christina "Meta" Ullings.  As an agent working on the investigation, I am familiar with
the criminal activities of Maria Ullings ("Ullings").  I submit this sworn affidavit pursuant to
Article X of the Extradition Treaty between the U.S. and the Republic of Italy, which states that
requests for extradition must be accompanied by, among other things, "documents, statements or
other information which set forth the identity and probable location of the person sought, with, if

available, physical description, photographs and fingerprints; and a brief statement of the facts of the case, including the time and location of the offense."

4.      Ullings is charged in an indictment dated 21 September 2010, with one count of conspiracy to fix certain surcharges of air cargo shipments to and from the United States in violation of Section 1 of Title 15 of the United States Code.

5.      During the course of the investigation, I have reviewed the various sources of evidence regarding the criminal activities of Ullings.  The evidence in this case includes, among other things, statements made by witnesses and co-conspirators, and extensive documentary evidence, including emails, which corroborated the information provided by the witnesses.

**Evidence of Ullings' Crime**

A.      Background

6.      Beginning in December 2005, the Antitrust Division of the Department of Justice, along with the FBI and other law enforcement agencies (collectively, U.S. authorities), have been investigating conspiracies by various air cargo providers and their employees to raise, fix, and maintain prices and surcharges.  These conspiracies, which affected and occurred in the United States, violate the Sherman Antitrust Act, Section 1 of Title 15 of the United States Code. In uncovering and prosecuting this cartel, the Department of Justice has brought charges against 21 executives and 22 corporations.  Over $1.8 billion in fines have been collected from these companies and numerous executives have been sentenced to imprisonment for their involvement. In the course of our investigation, U.S. authorities have obtained proof that Ullings and other competitors conspired with one another to fix the price of certain surcharges charged to customers.

7.      Air cargo carriers carry freight by air for their customers, freight-forwarders that are responsible for handling logistics and bundling shipments from companies looking to ship product, in this case, internationally.  Air cargo carriers charge freight-forwarders cargo costs that include a base rate and any surcharges.  The base rate is specific pricing, typically based on weight, on a route between a pair of cities.  The base rate, published typically two times a year, is negotiable.  Surcharges are added costs, typically associated with additional costs being incurred by the airlines, ostensibly to cover these costs.  Surcharges were not negotiable, and over the course of the conspiracy become a significant portion of the overall cargo costs.  The surcharges coordinated in this conspiracy were both fuel surcharges and a "September 11" security surcharge.

8.      Ullings, a citizen of the Netherlands, was a senior vice president of cargo sales for Martinair Holland N.V. (Martinair), a Dutch airline that shipped cargo all over the world, including to and from the United States.  As senior vice president of cargo sales, Ullings had responsibility for all price and surcharge decisions at Martinair.

B.      Ullings' Participation in the Criminal Price-Fixing Conspiracy Among Air Cargo Carriers

9.      As vice president of cargo sales, Ullings led and directed Martinair's participation in a long-running criminal conspiracy with other air cargo carriers to fix and manipulate prices and surcharges on air cargo shipments.  The conspiracy was designed to affect all prices that Martinair charged, including those for shipments of important United States Air Force parts to and from the Middle East and central Asia.

10.      Starting as early as January 2001, several major air cargo carriers met in Frankfurt, Germany to discuss fuel surcharge rates and other surcharge rates that would be applied to base fares.  The attendees agreed to charge the same fuel surcharge for all flights

across the North Atlantic and to coordinate moving forward on changes to the surcharge. The parties also agreed that the surcharge would not be negotiable. Ullings was directly responsible for implementing Martinair's involvement in this conspiracy and Martinair employees attended these meetings and others with Ullings' knowledge and approval.

11.     Between 2001 and 2006, Ullings regularly directed her subordinates to reach out to competitor airlines to discuss fuel surcharges. During these conversations, which oftentimes happened over the phone but sometimes in person, Ullings' subordinates and their competitors would exchange information about their plans to raise or maintain the fuel surcharge rate. Ullings' subordinates would discuss Martinair's future plans for the fuel surcharge and reach an understanding with their competitors on the rates to be announced to their customers. In addition to the amount, the conspirators would coordinate the timing of making any rate increases public to their customers. Ullings not only directed these conversations, but she received regular updates by email, phone and in person from her subordinates on a weekly basis that included both information about the plans of Martinair's competitors but also how Martinair should follow along. For example, on 22 March 2005, Ullings' subordinate emailed her to share that air cargo carriers Lufthansa, Cargolux, and KLM-Air France planned to announce that day that each would increase their fuel surcharge by .05 Euro by the 4th or 5th of April. The subordinate then suggested that Martinair announce the same increase, which would help make sure it stuck with customers. Ullings responded: "Agree." For another example, one employee even handed Ullings his phone during a meeting to show her text messages he exchanged with a competitor regarding coordinating the fuel surcharge.

12.     At least one of these subordinates will testify that Ullings was very careful in directing when Martinair would announce an increase to help disguise its agreement with its

competitors.  Martinair employees were also careful to keep these meetings and agreements amongst competitors secret from the customers.

13.     Ullings personally coordinated the amount and timing of fuel surcharges with competitors.   During the relevant time frame, Ullings met with executives from KLM every 6 to 8 weeks and the fuel surcharge was discussed in these meetings.  Specifically, on or about 31 January 2006, Ullings attended a meeting with executives from KLM in order to coordinate pricing on the fuel surcharge.  This meeting is documented in an email Ullings sent to her subordinates that says: "KLM will announce that the fuel surcharge will go up from .45 to .50 as of February 14."  Moving forward, Ullings directed Matinair's coordinated implementation of the increase per the meeting with KLM.

14.     In February 2006, Ullings became aware of the investigation by U.S. authorities while on a business trip to Shanghai.  Worried that evidence of her agreements with competitors would be uncovered, Ullings contacted a subordinate via phone and text and instructed him to get access to and delete all emails in her account related to the fuel surcharge.  This subordinate worked with another Martinair employee to gain access to Ullings' emails and discussed how to search for and delete certain emails related to the fuel surcharge.  The two employees then deleted the incriminating emails.

15.     The conspiracy Ullings and her co-conspirators were involved in impacted a significant amount of global air cargo shipments.  Martinair, which ultimately pleaded guilty in 2008, admitted that more than $160 million in its sales of air cargo services from the United States were affected by the conspiracy.  Two of Martinair's important competitors, air cargo carriers KLM and Cargolux, have also pleaded guilty to conspiring with Martinair.  In total, the three companies have acknowledged that their criminal conduct affected more than $860 million

in sales of air cargo services from the United States, and they have paid over $500 million in fines.

16.     Several of Ullings individual co-conspirators have accepted responsibility for their crimes.  In 2009, a direct subordinate accepted responsibility and pleaded guilty; he was sentenced to spend eight months in U.S. prison. In 2011, the former CEO of Cargolux and its former senior vice president of sales both pleaded guilty and were sentenced to serve 13 months in U.S. prison.  The United States has also brought charges against two KLM-Air France executives for their involvement in this conspiracy, but they continue to evade justice.

**Identification of Ullings**

17.     Maria Ullings is a citizen of the Netherlands, born on 28 April 1954, in the Netherlands.  On or about 8 November 2011, Interpol issued a "Red Notice" stating that Ullings was a fugitive wanted for prosecution in this case.  On or about 10 July 2019, Ullings was provisionally arrested for purposes of extradition to the United States.  A photograph of Ullings is attached as Attachment 1, which is corroborated by photographs in publicly available sources identifying Ullings as a longtime Martinair employee who served as a senior vice president for the company.

18.     This affidavit is sworn to before a Magistrate Judge of the United States District Court for the Northern District of Georgia, who is a person duly empowered to administer an oath for this purpose.

Davida K. Law
Special Agent
Federal Bureau of Investigation


Signed and sworn to before me this 29 day of July 2019, in Atlanta, Georgia

Linda T. Walker
United States Magistrate Judge
Northern District of Georgia

Page 7 of 8

**Attachment 1**: Photograph of Maria Ullings

