## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

United States of America,

v.                                            Case No. 1:10-cr-00406

Maria Christina "Meta" Ullings,        Michael L. Brown
                                       United States District Judge

                           Defendant.

_____/

## OPINION & ORDER

Defendant Maria Christina Ullings moves for a reduction of her sentence and release from imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  The Court grants her motion.

## I.    Factual Background

Ms. Ullings is a sixty-six-year-old resident of the Netherlands and a former Senior Vice President of MartinAir, a Dutch cargo carrier.  On January 23, 2020, she pleaded guilty to violating the Sherman Antitrust Act by conspiring with former coworkers to fix certain rates for air cargo services in the United States and elsewhere.  (Dkt. 17.)  In her plea agreement, the United States and Ms. Ullings explained that she "knew of and approved" her subordinates' conduct to violate antitrust laws.  (*Id.*

at 5.)  During a more recent hearing, counsel for Ms. Ullings explained "the primary basis for the charges against her was her tacit allowance of her underlings to make those agreements." (Dkt. 31.)  The United States did not challenge this characterization, and the Court believes it an apt description.  The parties also agree Ms. Ullings's involvement in the criminal activity ended in approximately February 2006 — fourteen years ago.

At the recommendation of the United States and Ms. Ullings, the Court sentenced her to eight months' imprisonment.[1]  The Court remanded Ms. Ullings into the custody of the United States Marshals Service on January 23, 2020.  Because of the spread of the novel coronavirus know as SARS-CoV-2 ("COVID-19"), the Bureau of Prisons ("BOP") has temporarily suspended the transfer of prisoners.  Ms. Ullings thus remains in the custody of the Marshal at the Robert A. Deyton Detention Facility, a privately-run facility in Lovejoy, Georgia.

---

[1] This included a six-month variance to account for the time authorities detained Ms. Ullings in Italy pending her extradition to the United States.  Again, both the United States and Ms. Ullings requested this variance and ultimate sentence.  (Dkt. 17 at 10–11.)

In her motion for compassionate release, Ms. Ullings asks the Court to reduce her sentence by four months so she may be released immediately. She argues that, as a result of her age and medical conditions, she faces a serious risk of complications and death should she contract COVID-19 while at the Deyton facility. (Dkt. 28.) As explained above, Ms. Ullings is 66-years old, placing her in an age group the CDC has identified as being at a high risk for serious illness and complications from COVID-19. *See Frequently Asked Questions: How COVID-19 Spreads*, Centers for Disease Control & Prevention (May 9, 2020).[2] According to the information provided by the United States at the time of sentencing, Ms. Ullings has other medical conditions, including hypertension and obesity, that place her at even greater risk. *Id.*; *see also Matos v. Lopez Vega*, _ F. Supp. 3d _ , No. 20-CIV-60784-RAR, 2020 WL 2298775, at *2 (S.D. Fla. May 6, 2020) (detailing how the virus spreads, higher risk factors, and those effects on prison populations).[3] The United

---

[2]  Available at https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Coronavirus-Disease-2019-Basics (last accessed May 12, 2020).

[3] Ms. Ullings's briefing in support of her motion details her health complications and includes an analysis of her medical records. (Dkts. 28 at 28–29; 28-3 at 2–4.) The United States presented each of these conditions to the Court at the sentencing hearing. (*See* Dkt. 26 at 3, 19–

States opposes her motion and insists she serve the final four months of her sentence.  (Dkt. 29.)

## II.    Legal Standard

Generally, a court is statutorily prohibited from modifying a term of imprisonment once imposed.  *See* 18 U.S.C. § 3582(c).  A handful of statutory exceptions exist, however, one of which allows a court to grant an inmate compassionate release if the inmate meets certain requirements.  *See* 18 U.S.C. § 3582(c)(1)(A).  The First Step Act of 2018 amended the procedural requirements for such a motion.  *Id.*  An inmate need not depend on the Bureau of Prisons to seek her compassionate release.  Instead, she may move for compassionate release after having "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on [her] behalf or the lapse of 30 days from the receipt of such a request by the warden of [her] facility, whichever is earlier."  *Id.*  Once the exhaustion requirement is met or

---

26.)  The United States, however, now asserts "her medical claims are unsubstantiated."  (*See* Dkt. 29 at 14–15.)   The Court believes it abundantly reasonable to rely on medical information the United States presented to it just four months ago as part of the sentencing hearing, particularly when the United States has not now requested a medical examination of Ms. Ullings in response to her motion.  (*Id.*)

obviated, an inmate must show that "extraordinary and compelling reasons" warrant her compassionate release. *See* § 3582(c)(1)(A)(i). By statute, a court must also consult the sentencing factors set forth in 18 U.S.C. § 3553(a). Finally, a court must determine that such a reduction reflects the applicable policy statements issued by the United States Sentencing Commission. § 3582(c)(1)(A).

The Commission's policy statement for compassionate release is found in section 1B1.13 of the Sentencing Guidelines, which echoes the statutory requirements and requires a finding that "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." The Application Notes to section 1B1.13 explain that an inmate's medical condition may constitute "extraordinary and compelling" circumstances for compassionate release, including when an inmate is suffering from a debilitating medical condition that has "substantially diminishe[d] the ability of the [inmate] to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover." U.S.S.G. § 1B1.13(1)(A)(ii). The Application Note also contains a residual clause to provide relief for other "extraordinary and compelling reasons." *Id.* § 1B1.13(1)(D).

5

The Sentencing Commission has not updated section 1B1.13 since the passage of the First Step Act. Its policy statement thus does not reflect the liberalization of the procedural requirements. *See United States v. Ebbers*, _ F. Supp. 3d _ , No. (S4) 02-CR-1144-3 (VEC), 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020). But, on its face, the First Step Act only amended § 3582 to expand an inmate's access to the courts. It does not purport to expand or alter the standard for compassionate release or more fully define the terms "extraordinary" or "compelling." Nevertheless, the Court agrees with other courts in holding that section 1B1.13 provides helpful guidance but does not constrain the issues a court may consider in assessing whether a defendant's application for compassionate release provides "extraordinary and compelling reasons" for a sentence reduction under § 3582(c)(1). *See id.*; *United States v. Perez*, _ F. Supp. 3d _ , No. 17 Cr. 513-3(AT), 2020 WL 1546422, at *4 (S.D.N.Y. Apr. 1, 2020) (granting compassionate release after considering the residual clause). The Court thus "finds that it is authorized to consider the enumerated circumstances, as well as circumstances other than, or in combination with, the enumerated circumstances." *United States v. Kowalewski*, No. 2:13-cr-00045-RWS

6

(N.D. Ga. Apr. 30, 2020), ECF No. 251 at 12 (collecting cases agreeing and disagreeing with this interpretation of "broadest set of circumstances to qualify for relief"). The Court thus considers the § 3553(a) factors, the Sentencing Commission's guidance in section 1B1.13, and the individual situation and circumstances presented by Ms. Ullings's application.

## III.   Analysis & Discussion

### A.   Administrative Exhaustion

As a threshold matter, the Court holds Ms. Ullings's motion is properly before it. She is in custody, but not BOP custody. As a result, the BOP will take no action on her request for compassionate release, and she has no administrative remedies available to challenge that decision. Zachary Kelton, Associate General Counsel for the BOP, has confirmed his organization will not consider her application for compassionate release. (Dkt. 28 at 15–16.) She has no BOP action to contest or to start the clock on the thirty-day timer after which she can file her own motion. Of course, a court may waive the exhaustion requirement when administrative remedies are effectively unavailable or obviously futile. *See Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019).

And this Court agrees with other courts in holding that exhaustion of BOP administrative remedies is futile and unavailable for custodial defendants who have been sentenced but are not yet in BOP custody. *See, e.g.*, *United States v. Pinkerton*, No. 15-cr-30045-3, 2020 WL 2083968, at *4–5 (C.D. Ill. Apr. 30, 2020) ("Mandating the exhaustion requirement in this case and other cases around the country during the COVID-19 pandemic cannot be what Congress intended."); *United States v. Jepsen*, No. 3:19-cv-00073(VLB), 2020 WL 1640232, at *3 (D. Conn. Apr. 1, 2020) (granting compassionate release request of detainee in the "Catch-22" situation of being unable to exhaust because he was in a "non-BOP facility"); and *United States v. Gonzalez*, No. 2:18-CR-0232-TOR-15, 2020 WL 1536155, at *1 (E.D. Wash. Mar. 31, 2020) (granting compassionate release request of detainee held in county jail pending BOP designation and transfer). Driving all this home, the United States — while insisting Ms. Ullings should not be released — agrees she has exhausted any administrative remedies. (Dkt. 29 at 10.)

## B.    Section 3553(a) Factors & Extraordinary and Compelling Reasons

About a month ago, President Trump recognized a rapidly evolving public health crisis and declared a national state of emergency to bring

additional resources into the fight against the further spread of COVID-19. *Presidential Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, Mar. 13, 2020. On that day, he announced that 1,645 people from forty-seven states had contracted the virus that causes COVID-19. Today, that number stands at 1,342,594 Americans infected and 80,820 dead. *Coronavirus Disease 2019 (COVID-19), Cases in the U.S.*, Centers for Disease Control and Prevention.[4] The Court need not further document the extraordinary and unprecedented challenges this country faces in its battle with the virus. They are known to nearly everyone.

Based on the particularly infectious nature of the virus, the CDC and state governments have advised individuals to practice social distancing and good hygiene. But social distancing can be difficult for individuals living or working in a prison. *See* New England Journal of Medicine, *Flattening the Curve for Incarcerated Population—Covid-19 in Jails and Prisons* (Apr. 9, 2020). Indeed, conditions of imprisonment create the ideal environment for the transmission of infectious diseases.

---

[4] Available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed May 12, 2020).

As the CDC has noted, "[i]ncarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced."  Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020).  The CDC thus recognizes the herculean challenge of keeping prison facilities insulated from COVID-19:

> There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members.  Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

*Id.*  Limited space and overpopulation, inadequate ventilation, and lack of resources all contribute to the spread of infectious disease in jails and prisons.  So "[e]ven *without* a highly contagious pandemic, there is always an unfortunate risk that detainees will be exposed to certain communicable diseases."  *Matos*, 2020 WL 2298775, at *10.  Detained populations also tend to be in poorer health and suffer from a higher prevalence of infectious and chronic diseases than the general

population.  *See Fraihat v. U.S. Immigration and Customs Enforcement*, _ F. Supp. 3d _ , No. EDCV 19-1546 JGB (SHKx), 2020 WL 1932570, at *5–6 (C.D. Cal. Apr. 20, 2020) (discussing CDC Interim Guidance and granting preliminary injunction to inmate defendants in the light of COVID-19).  And to make matters worse, medical care of prisoners is often limited at the best of times.  *See* U.S. Dep't of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (Mar. 2016) (finding BOP experienced chronic medical staff shortages, leading to problems meeting the medical needs of prisoners, requiring the use of outside hospitals, and endangering the safety and security of institutions).[5]

In response, the United States insists the mere elevated risk of exposure to COVID-19 does not by itself equate to an extraordinary and compelling reason to reduce a defendant's sentence.  (Dkt. 29 at 12.)  That may be.  Each situation must be considered independently.  Having considered the relevant factors set forth in 18 U.S.C. § 3553, the Court

---

[5] Available at https://oig.justice.gov/reports/2016/e1602.pdf (last accessed May 12, 2020).

finds that Ms. Ullings's specific situation presents extraordinary and compelling reasons justifying a reduction of her sentence to time served.

Medical records and information presented to the Court at the time of her sentencing show Ms. Ullings suffers from three chronic conditions considered by medical experts to place her at a higher risk of severe complications and death from COVID-19. She is 66-years old, older than the CDC's cut off for high-risk groups of 65 years. *See* Centers for Disease Control and Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*.[6] She suffers from hypertension and obesity, two other CDC-identified comorbidities that increase the likelihood of serious risk from COVID-19. *See id*.[7] The

---

[6] Available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last accessed May 12, 2020).

[7] Ms. Ullings presented an affidavit from Dr. Richard Goldberg, a former medical doctor who works as a medical consultant for the Justice Advocacy Group. (Dkt. 28-3 at 2.) He provided more authority for Ms. Ullings's contention that hypertension places her at a higher risk of becoming infected and developing more severe symptoms from the virus. He explained, for example, the American Heart Association has said that, based on current information, "it appears elderly people with coronary heart disease or hypertension are more likely to be infected and to develop more severe symptoms." (*Id*. (*citing* https://www.heart.org/en /coronavirus/coronavirus-covid-19-resources).) He also cited a recent review in the Mayo Clinic Proceedings that notes a report issued by the Italian Ministry of Health showing "the most common comorbidities in a

United States does not dispute that these three conditions place Ms. Ullings in a high-risk category for contracting COVID-19 and suffering serious, perhaps life-threatening, complications from it.

The United States has outlined steps the Bureau of Prisons has taken to protect Ms. Ullings and other inmates. (Dkt. 29 at 5–7.) Those steps are largely irrelevant here, however, as Ms. Ullings is not in its custody and may never go there. The United States has also explained that the Deyton facility has instituted certain practices to protect inmates from the spread of COVID-19, including by issuing masks and instituting social distancing measures, like having inmates eating in cells. (*Id.* at 4–6.) Ms. Ullings, however, has submitted a declaration (through counsel) challenging those assurances and confirming the difficulty of social distancing for incarcerated individuals. (Dkt. 30-1.) She explained, for example, that while inmates had to eat in their cells for a short time, they now eat in a common room and spend most of their

---

cohort of 481 patients who died with COVID-19 were hypertension (74%), diabetes (34%), ischemic cardiopathy (30%), and atrial fibrillation (22%)." (*Id.* (*citing* https://mayoclinicproceedings.org/retrieve/pii/S00256196 20303153).) Other than referring to Dr. Goldberg as an "advocate," the United States does not contest his medical opinion or seek to provide its own.

time in that room.  (*Id.* ¶ 11.)  She attested that she cannot effectively distance herself while at the facility.  (*Id.* ¶ 12.)

The Court also notes that — while the United States says the Deyton staff was issued facemasks to protect themselves and inmates — during two videoconferences on Ms. Ullings's motion, the Court could see staff members sitting behind Ms. Ullings without properly wearing their facemasks.  One guard had his mask under his chin, while the other had it hanging from his ear — both undermining the United States's assurances the facility is doing all it can to protect Ms. Ullings.  It is also worth noting that Ms. Ullings is housed at a facility in Georgia.  As of today, Georgia has had 34,635 confirmed cases of COVID-19, 1,461 deaths from the virus, and "re-opened" before any other state, without having met public health experts' three-phase guidance and despite contrary advice from President Trump.  Georgia Department of Public Health, Georgia Overall COVID-19 Status;[8] *Georgia Gov. Disregards Trump Criticism, Moves Ahead with Plans to Reopen*

---

[8] Available at https://dph.georgia.gov/covid-19-daily-status-report (last accessed May 12, 2020).

*Business*, NPR (Apr. 23, 2020).[9]  The Court cannot ignore the fact that Ms. Ullings is held in a facility run by people living in a state that took these drastic steps — particularly when the Court witnessed staff members flouting the requirement that they wear facemasks.  The parties also agree there have already been three known cases of COVID-19 at the Deyton facility, one inmate and two guards.  (Dkt. 29 at 17.)

In addition, Ms. Ullings has (or will have) served more than half of the sentence imposed before she is released under this order.  The nature and circumstances of the offense also support her compassionate release.  She was not the leader or mastermind behind the antitrust violations but rather failed to stop her subordinates' illegal conduct.  She committed a non-violent offense that (according to Ms. Ullings and not contested by the United States) was not even a crime in the country where she lived.  She committed the offense fourteen years ago and has no other criminal history.  Her criminal conviction, prison sentence, and incarceration for least a part of that sentence have already provided deterrence to others.  She needs no specific deterrence, and the Court finds that she is unlikely

---

[9] Available at https://www.npr.org/sections/coronavirus-live-updates/2020/04/23/843051338/georgia-gov-disregards-trump-criticism-moves-ahead-with-plans-to-reopen-business.

to reoffend as a result of her age, her retirement from the offending company, and her lack of any prior criminal record.  She is not a danger to anyone.  After considering each of the § 3553(a) factors, the Court holds that Ms. Ullings's situation presents the quintessential mix of "extraordinary and compelling reasons" to provide a compassionate release reduction to her sentence.

Such a reduction also adheres to the Sentencing Commission's policy statements.  The relevant policy statement explains that a court may order a sentence reduction under § 3582(c)(1)(A) when it determines, "after considering the factors set forth in 18 U.S.C. § 3553(a)," that "(1)(A) extraordinary and compelling reasons warrant the reduction; . . . (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and (3) the reduction is consistent with this policy statement."  U.S.S.G. § 1B1.13.  The commentary to section 1B1.13 provides that certain circumstances constitute "extraordinary and compelling reasons" and warrant a sentence reduction. § 1B1.13 cmt. n.1.  One of the circumstances is where "an extraordinary and compelling reason other than, or in combination with," the listed circumstances is present. § 1B1.13 cmt. n.1(D).  For the

reasons set forth above, the Court concludes Ms. Ullings's situation satisfies this policy statement and warrants a reduction of her term of imprisonment.

The United States warns the Court that its order sets a bad precedent for the wholesale reduction of sentences amid the coronavirus outbreak. It does not. The Court reaches its decision based on the specific, arguably unique, facts presented by Ms. Ullings's medical condition, the circumstances leading to her criminal conviction, her other personal circumstances, the sentence she received and that she has already served, and the specific conditions of her current incarceration (including the circumstances the Court witnessed during two videoconference hearings). Subsequent cases will rise or fall on their own merits, with this case predetermining no outcomes.

## IV. Conclusion

For the reasons set forth above, the Court **GRANTS** Defendant Maria Christina Ullings's Emergency Motion for Reduction of Sentence (Dkt. 28).

The Court **REDUCES** Defendant's sentence to time served.

17

The Court **ORDERS** the U.S. Marshal to transfer Defendant to the custody of U.S. Immigration and Customs Enforcement ("ICE") and **ORDERS** ICE to effectuate this Court's January 23, 2020, Order of Judicial Removal by removing Defendant from the United States to the Netherlands, or allowing her to voluntarily remove herself at her own expense to the Netherlands, as promptly hereafter as can be effectuated. If removal is not effectuated within fourteen (14) days from the date of this Order, the Court **ORDERS** ICE to report back to the Court on the status of the removal.

The Court **DIRECTS** the government to make ICE aware of this Court's order forthwith.

**SO ORDERED** this 12th day of May, 2020.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE